IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2017 Session

## STATE OF TENNESSEE v. ANTHONY BLACKWELL

**Appeal from the Circuit Court for Giles County**
**No. CR16292        Russell Parkes, Judge**

_____

### No. M2016-01063-CCA-R3-CD

_____

The Defendant, Anthony Blackwell, was convicted by a Giles County jury of the aggravated rape of a child, a Class A felony, and sentenced as a Range III, Persistent Offender to fifty-years' imprisonment at one-hundred percent service. On appeal, the Defendant contends that the evidence was insufficient to support his conviction, that the trial court erred by allowing certain medical testimony and records pertaining to "child sexual abuse," and that his sentence was unlawful. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Hershell Koger, Assistant Public Defender (at trial and on appeal), and Brandon E. White (on appeal), Columbia, Tennessee, for the Defendant-Appellant, Anthony Blackwell.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Brent A. Copper, District Attorney General; and Chuck Crawford and Jonathan Davis, Assistant District Attorney Generals, for the Appellee, State of Tennessee.

### OPINION

On July 10, 2013, the Giles County Grand Jury indicted the Defendant for the aggravated rape of a child, four-month-old A.T.[1] The offense occurred in June 2013 while the Defendant cared for the child when the victim's mother was at work.

_____

[1] It is the policy of this court to refer to minor victims by their initials.

The Defendant filed several pretrial motions, including two motions to redact portions of A.T.'s medical records from three different treatment providers, Hillside Hospital, Vanderbilt Children's Hospital, and Our Kids Center. On September 23, 2015, the trial court held a pretrial hearing on the Defendant's motions.

At the hearing, defense counsel argued that references in the medical records to "child abuse" or "child sexual abuse" were highly prejudicial and were not an appropriate medical diagnosis. The trial court reserved ruling on most of the challenged statements until trial but did order two statements redacted from the Our Kids Center records. After the hearing, the Defendant filed a motion to preclude testimony from Dr. Kevin Oothout[2] regarding "child sexual abuse" and requested the trial court reconsider the admission of A.T.'s medical records. The trial court overruled the Defendant's motion. A jury trial began on October 5, 2015, at which the following evidence was presented.

**Trial.** The victim's mother testified that, in June 2013, the Defendant had been living with her and her fiancé for about two months. During this time, the Defendant would occasionally babysit A.T. and his two-year-old brother when the victim's mother was at work. Shana Martin, a family friend, regularly cared for the children while the victim's mother was at work. On June 8, 2013, Martin cared for the children until around 5:00 or 6:00 p.m. when the victim's mother returned from work. The victim's mother testified that A.T. did not have any injuries when she bathed him and put him to bed on the night of June 8, 2013.

The Defendant offered to care for the children the next day, June 9, 2013, while the victim's mother was at work. The victim's mother left for work around 6:00 a.m. while the children were still asleep. She testified that the Defendant was in the living room, and that he had been out all night and had not slept at all. However, the Defendant told her he was still able to babysit the children, and she testified that the Defendant was "acting fine" and that she "trusted to leave [her] kids with him."

The victim's mother testified that she next heard from the Defendant around 12:30 p.m., when he called her and said that A.T. "had had a bowel movement and he was bleeding just a little bit." Around 12:45 p.m., the victim's mother texted the Defendant and told him she would "pick up some juice for [A.T.] for constipation after [she] got off work." She did not speak with the Defendant again until she got home from work around 5:30 p.m. When the victim's mother arrived home, she asked the Defendant where A.T.'s soiled diaper was so that she could inspect it. The Defendant responded that he

---

[2] This witness is referred to as both Dr. "Oothoud" and Dr. "Oothout" in portions of the transcripts and by the parties. For consistency, we will refer to him as Dr. "Oothout," as indicated in the Hillside Hospital medical records.

had thrown the diaper away in a nearby dumpster because "it smelled really bad." The victim's mother testified that the Defendant left about ten minutes after she arrived, and that he appeared to be in a hurry. She then checked A.T.'s diaper and noticed that "[A.T.]'s rectum was bigger, it was red, it was swollen," and "[i]t was torn in one place." The victim's mother decided to take A.T. to the emergency room at Hillside Hospital. She called the Defendant and told him that she was "taking [A.T.] to the ER for constipation," and asked if he could come back to babysit A.T.'s brother. The victim's mother testified that, at the time, she believed A.T.'s injuries were due to constipation, and she still trusted the Defendant to watch her other son.

At the Hillside Hospital emergency room, A.T. was initially diagnosed with an infection. However, after a second examination of A.T., the doctor informed the victim's mother that he was suspicious of A.T.'s injuries, and he called the Department of Children's Services. The victim's mother testified that A.T. was later transferred to Vanderbilt Children's Hospital by ambulance, where he was hospitalized for two days and was further examined.

On cross-examination, the victim's mother confirmed that, when she brought A.T. to the hospital, he had been suffering from "a small diaper rash" for the past two days. However, she did not tell anyone at Hillside Hospital about the rash "because [she] figured it was just a diaper rash." The victim's mother did not tell anyone at Hillside Hospital that she had concerns about A.T.'s care. On redirect, the victim's mother again confirmed that there was no bruising, swelling, or tearing to A.T.'s anus when she bathed him the night before, and that there were no other adults around A.T. after she gave him the bath other than the Defendant and herself.

Shana Martin testified that she had been a friend of the victim's mother for eight years and that she would babysit A.T. "[a]t least a couple of times a week." Martin testified that she watched A.T. on June 8, 2013, while his mother was at work, and that the Defendant was also at the apartment. Martin testified that she changed A.T.'s diaper multiple times that day and that she did not notice anything unusual, including any redness, swelling, bruising, or tearing to his anus. Martin also testified that there was no blood in A.T.'s stool or anything else unusual about his diapers. Martin denied that she cut A.T. with her fingernails or caused any injuries to A.T.

The victim's father testified that he had been engaged to the victim's mother for about two years and that they had been together for about eight years. He said that, on the weekend of June 8 and 9, 2013, he was serving time in the Giles County Jail for violation of his probation. The victim's father testified that he met the Defendant at a local tattoo parlor and invited the Defendant to live with his family for a few months when the victim's mother was pregnant with A.T. After a while, the Defendant moved to

Alabama for a few months, and then he returned to live with the family again. The victim's father testified that the Defendant lived with them for a month or two before the incident occurred. He said that he was not an active father and that he had never bathed A.T. or changed his diaper. He testified that he last saw A.T. on June 7, 2013, around 6:30 p.m. before reporting to jail and that he did not injure A.T. in any way.

Kelly Duncan testified that she had been a registered nurse for fourteen years and that she was working in the emergency room of Hillside Hospital on June 9, 2013. Duncan testified that she examined A.T. after he had initially been seen by a nurse intern. At that time, A.T.'s mother requested that Duncan look "at A.T.'s bottom area." Duncan testified that, when she examined A.T.'s bottom, she noticed "bruising all over . . . the cheeks of his bottom" that was "kind of red and a very dark purple." Duncan also testified that A.T.'s anus was dilated about four times the normal size for an infant and that "there was tearing that extended from his anus all the way up to what would be his bottom." Duncan testified that, because of the color of the bruising, she believed the injuries were fairly new. Duncan said that there was no evidence that A.T. was constipated and that they charted a normal stool while A.T. was in the emergency room. Duncan also testified that there was no evidence a hard stool had caused the injuries to A.T. Duncan confirmed that A.T. was four months old and weighed 16.99 pounds when he was examined. After her examination, Duncan asked Dr. Oothout to physically examine A.T. as well. Although Dr. Oothout had already seen A.T. in the examination room and examined his diaper, he had not looked at A.T.'s bottom. After Duncan and Dr. Oothout examined A.T. together, they immediately contacted the Department of Children's Services and the Pulaski Police Department. Duncan testified that Giles County EMS transferred A.T. and his mother to Vanderbilt Children's Hospital where he could be evaluated for trauma. Duncan explained that the transfer was requested because they "suspected sexual abuse," and Vanderbilt had experts that focused on children and abuse.

On cross-examination, Duncan confirmed that A.T.'s medical records reflected that his "symptoms began or occurred gradually two days ago," and that this was noted in A.T.'s medical records by Dr. Oothout. On redirect, Duncan denied that A.T.'s injuries could have been caused by digital extraction or a fingernail cut. Duncan testified that A.T.'s injuries were caused by an object larger than a finger to cause the amount of dilation to his anus. Duncan testified that, in her fourteen years of experience as a nurse treating both adults and children, she had never seen injuries like those suffered by A.T.

Dr. Kevin Oothout, an expert in the field of emergency medicine, testified that he was a physician at Hillside Hospital in June 2013. Dr. Oothout, along with Duncan, treated A.T. on June 9, 2013. A.T.'s medical records from Hillside Hospital were admitted into evidence without objection. Dr. Oothout confirmed that A.T. arrived at the

emergency room for injury to his rectum, and that he did both a preliminary examination and a second more thorough examination. During the preliminary examination, Dr. Oothout testified that he mostly relied on the nurse intern's information. Dr. Oothout testified that, during his later examination, he thoroughly examined A.T.'s rectum and that his diagnosis was that "[t]here was tears to the rectum, there was dilation of the rectum, and there was bruising around the rectum." Dr. Oothout concluded that A.T.'s injuries were caused by "non-accidental trauma. There was a high index of suspicion for some type of abuse." Dr. Oothout confirmed that he chose "child abuse" as the diagnosis in A.T.'s medical records. Dr. Oothout explained that their medical records are kept electronically, and that "[he] looked for rectal injury in that drop down menu and it wasn't available, and [he] felt like [child abuse] was the closest thing that [he] could cho[o]se from the list that fit."

Dr. Oothout opined that A.T.'s injuries "probably occurred in the last 48 hours before [he] saw [A.T.]." Dr. Oothout based his opinion "[o]n the color of the bruising, the fact that the tears were not healed and the bruising still was red to purple, which is consistent with within 48 hours." Dr. Oothout testified that he did not believe that A.T.'s injuries were accidental, particularly considering that A.T. was four months old and could not have injured himself. Dr. Oothout concluded that, based on his observations, "something was placed inside the child's rectum with force enough to cause the bruising and large enough [in] diameter to cause the tearing," or, in other words, A.T. suffered "inflicted trauma caused by penetration." Dr. Oothout testified that, because of A.T.'s injuries, he was obligated to contact the police and the Department of Children's Services and to transfer A.T. "to a bigger medical center to make sure there weren't other injuries that were deeper." Dr. Oothout testified that constipation, application of ointment, digital extraction, or fingernails could not have caused A.T.'s injuries. Rather, Dr. Oothout testified that A.T.'s injuries were caused when "[s]omething was placed into the rectum with force that was probably larger [in] diameter than your finger and smaller than a baseball bat." Dr. Oothout testified that, in his two decades as an emergency room physician, he had never seen injuries like A.T.'s injuries on an infant.

Defense counsel objected to the presentation of the State's next witness, Lori Litrell, a medical provider from Our Kids Center. The parties agreed to first conduct a direct examination of Littrell "for purposes of qualifications" and then to conduct a voir dire outside the presence of the jury to determine whether she would be qualified as an expert witness. As to her qualifications, Littrell testified that she was a physician assistant at Our Kids Center, an outpatient clinic of Nashville General Hospital. Littrell testified that Our Kids Center "perform[s] forensic medical evaluations on children when there are concerns of sexual abuse." Littrell testified that she had a master's degree in nursing and was licensed as both a family nurse practitioner and physician's assistant. Littrell stated that she received specialized training in and presented lectures on child

sexual abuse. Littrell said she was also a member of the American Academy of Pediatrics and the American Professional Society on the Abuse of Children, which provided her with continuing education and resources in the field of child sexual abuse. Littrell estimated that she had given approximately fifty presentations or lectures on topics relating to child sexual abuse. Littrell testified that her training at Our Kids Center included forty hours of classroom training and observation or performance of one-hundred supervised examinations before becoming an independent provider. Littrell estimated that she had performed over one-thousand forensic examinations. Littrell said that she had testified multiple times in cases of child sexual abuse and was qualified as an expert witness in all prior cases.

After Littrell presented her qualifications, the trial court held a hearing outside the presence of the jury to determine whether Littrell would be qualified as an expert witness and to rule on the Defendant's motion to redact portions of the Our Kids Center medical records. Defense counsel voir dired Littrell regarding her background and the function of Our Kids Center. Littrell testified that "[Our Kids Center] do[es] not diagnose sexual abuse." Rather, Littrell said that she intended to testify that A.T.'s injuries were "the result of penetrated trauma." After defense counsel's voir dire, the State requested that the trial court qualify Littrell as an expert witness in the field of "child sexual abuse, and specifically, in the area of conducting and evaluating forensic examination[s] of alleged child abuse victims." Defense counsel argued that, although Littrell may be an expert in the field of child sexual abuse, it was not "relevant for the case that we're here on today" because the charges against the Defendant were for aggravated rape of a child, not child abuse. The State responded that "a finding of inflicted injury from penetrated trauma, is very relevant and something that the jury can conclude is child sexual abuse." The trial court ruled that Littrell had specialized knowledge and that, "based on her education, training, field of specialty, [and] her prior certifications," Littrell was accepted as an expert in the field of child sexual abuse. The trial court then proceeded to hear from the parties regarding the redaction of the Our Kids Center medical records. The trial court ordered certain portions of the records redacted and the State proceeded with its direct examination of Lori Littrell.

Littrell testified that children were referred to Our Kids Center by law enforcement, the Department of Children's Services, referrals from other medical providers, and by concerned parents. She explained the procedures for an examination and testified that each exam was documented by photographs, videos, or a combination of both. Littrell testified that, on June 10, 2013, she performed the forensic examination of A.T. and created a report on the examination, which was admitted without objection. Littrell testified that she observed redness, bruises, and swelling around A.T.'s anal area, and that the anal opening was dilated. Littrell also noted two separate anal tears. Littrell testified that the examination was performed at the Vanderbilt Children's Hospital

emergency room and that the examination was recorded and photographed. Littrell identified multiple photographs of A.T.'s bruised and torn anal area, which were admitted into evidence and published to the jury without objection. Littrell also identified a video of A.T.'s examination, which was admitted into evidence and played for the jury. Littrell testified that, based on her experience, she classified A.T.'s injuries as acute, meaning that they would have happened "any time in the last 72 hours, but there's no way to pinpoint an exact date." Littrell also testified that she "found the injuries consistent with penetrative trauma." Litrell said that "[t]here was no history whatsoever of any sort of accident." Litrell also said that A.T.'s injuries could not have been caused by constipation, application of ointment, or digital extraction. Although Littrell opined that it was "possible" some of A.T.'s injuries could have been caused by long fingernails, she explained that she "wouldn't expect fingernails to cause bruising."

Dr. Cristina Estrada testified that she was employed at Vanderbilt Children's Hospital where she served as an associate professor of pediatrics and emergency medicine and the division chief of pediatric emergency medicine and the fellowship training program for pediatric emergency medicine. Dr. Estrada testified that her primary duty was to work as a physician in the pediatric emergency room and treat children at Vanderbilt Children's Hospital. Dr. Estrada testified that she had evaluated approximately 70,000 children, including approximately 30,000 infants, since she began practicing medicine in 2001. Dr. Estrada was qualified as an expert in the field of pediatric emergency trauma and general pediatric emergency room care. Dr. Estrada testified that she treated A.T. at the Vanderbilt Children's Hospital emergency room in the early morning hours of June 10, 2013. A.T.'s medical records from his hospitalization at Vanderbilt Children's Hospital were admitted into evidence without objection. Regarding A.T.'s injuries, Dr. Estrada testified that he had "a tear . . . [on] his anus as well as some bruising around his anus and he also had a bruise to his lower back." Dr. Estrada said that the bruising and tear were "significant" and that the tear "was at least one centimeter in depth and length." Dr. Estrada testified that the tear was significant because it was not an anal fissure and "did not appear to have occurred by normal routine daily life." Dr. Estrada also testified that A.T.'s rectum "appear[ed] enlarged and dilated." Dr. Estrada confirmed that she relied on Littrell's examination and notes in treating A.T. as well. Dr. Estrada testified that she had seen injuries similar to A.T.'s injuries and that they were "exclusively penetrating traumatic injuries." Dr. Estrada also testified that A.T.'s injuries could not have been caused by digital extraction, a fingernail cut, constipation or a hard-stool bowel movement. Dr. Estrada concluded that "[b]ased on the child's developmental age and stage, these would certainly have to be by penetrating trauma." On redirect examination, Dr. Estrada also confirmed that she "100 percent believe[d] that this was as a result of sexual abuse." Dr. Estrada noted that it was "very difficult to stage or age any of [A.T.'s] injuries," but that "they appear to be more recent than not."

Dr. Harold Lovvorn, an expert in the field of pediatric surgical care, testified that he was a faculty pediatric surgeon at Vanderbilt Children's Hospital. Dr. Lovvorn also treated A.T. at Vanderbilt Children's Hospital on June 10, 2013. Dr. Lovvorn testified that he performed an exam of A.T. under anesthesia in the operating room in order to get a complete and thorough exam both externally and internally. Dr. Lovvorn testified that he observed "pretty significant injuries to [A.T.'s] anal region," including "two lacerations" and bruising around his anal opening. Dr. Lovvorn testified that the injuries were "very unusual in a four-month-old baby and [were] highly suspicious for injury inflicted upon the child." Dr. Lovvorn explained that, at four months old, a baby is not mobile, and his limited movements could not have caused the injuries. Dr. Lovvorn also testified that there was no "consistency with passage of a firm stool that would have caused that level of injury." Dr. Lovvorn confirmed that A.T.'s injuries were likely caused by a type of penetration. Dr. Lovvorn said that he "would put the injury somewhere around 12 hours would be [his] best estimate." On redirect, Dr. Lovvorn opined that the object used to penetrate A.T.'s anus would have been about an inch or more in diameter.

Investigator Ryan Southerland of the Pulaski Police Department testified that he was notified about A.T.'s case on June 10, 2013. Investigator Southerland obtained A.T.'s medical records, spoke with medical personnel at Hillside Hospital, Vanderbilt Children's Hospital, and Our Kids Center, and interviewed the victim's mother after A.T. was released from the hospital. After the interview, Investigator Southerland also searched for A.T.'s diapers that were allegedly thrown in the dumpster, but no diapers were found. Investigator Southerland said that the dumpster was "half to less than half" full and was located thirty to forty feet away from the balcony of the victim's mother's apartment.

Investigator Southerland confirmed that A.T.'s mother was at work on June 9, 2013, and A.T.'s father was incarcerated all weekend. On June 12, 2013, Investigator Southerland located the Defendant, who agreed to come to the police department for an interview. Investigator Southerland testified that the interview lasted around an hour and that it was video and audio recorded. The video was admitted without objection and played for the jury. Investigator Southerland testified that the Defendant was asked multiple times during the interview what happened to A.T. First, the Defendant told Investigator Southerland that the only thing he noticed was blood in the diaper. The Defendant told Investigator Southerland that he spoke with A.T.'s mother on the phone and that she advised him "to put Vaseline on it." Later in the interview, the Defendant mentioned that there were also rips to A.T.'s anus as well as a green and off-white substance. Investigator Southerland testified that each time the Defendant was asked about what happened, he noticed and recalled different things. The Defendant also told

Investigator Southerland repeatedly that he did not do anything to A.T. The Defendant told Investigator Southerland that the night before he babysat A.T. he was painting at a friend's house and consumed "six or seven" beers and was intoxicated. The Defendant told Investigator Southerland that he arrived back at the apartment around 4:30 a.m. and that he had been up all night. Investigator Southerland also testified that the Defendant said during his interview that "he may have got [sic] rough with the child and . . . he wasn't going to deny that he did get rough with the child." During the interview, a DNA swab was taken from the Defendant. After the interview, Investigator Southerland prepared rape kits to be sent to the Tennessee Bureau of Investigation ("TBI"), obtained final copies of the medical records, and presented the case to the Giles County Grand Jury.

On cross-examination, Investigator Southerland confirmed that A.T.'s mother, A.T.'s father, and Martin were never suspects. Investigator Southerland did not recall reading in the Hillside Hospital medical records that A.T.'s injuries had "began, occurred gradually two days ago." Investigator Southerland also did not recall if A.T.'s mother told him that A.T.'s injuries had started or gotten worse two days before he was taken to the hospital.

Casey Koza, a forensic technician formerly employed by the TBI, testified for the defense. Koza testified that, in June 2013, she specifically worked in the area of forensic biology and serology. Regarding A.T.'s case, Koza testified that she received two sexual assault kits containing various bodily swabs, an article of baby's clothing, and two diapers with wipes. Koza testified that, given the charge of aggravated rape of a child, she was testing only for semen on the items she received, and that all items tested negative for the presence of semen. According to TBI policy, because no semen was found, none of the items were sent for any further DNA testing. On cross-examination, Koza confirmed that the presence of fecal matter in A.T.'s diapers made it difficult to test for semen and that she could not conclusively say there was no semen present. Koza also testified that the fecal matter contained bacteria which could degrade biological evidence over time, and that the diapers were not examined until August and September 2013. Koza also confirmed that diaper changes would have affected whether there were any fluids present for testing and that condom use would have eliminated the biological evidence.

The Defendant testified that he met A.T.'s father and mother at a tattoo shop in Pulaski, Tennessee, where his girlfriend worked. The Defendant testified that he lived in Huntsville, Alabama at that time and wanted to move to Pulaski, so the victim's father invited him to stay at his house until he found work. The Defendant confirmed that he had a criminal history, including felony theft and burglary convictions. The Defendant testified that he did not have a job and that he would frequently watch A.T. and his

brother while A.T.'s mother was at work. The Defendant testified that he did not watch the children on June 8, 2013, but that he did watch them the next day, June 9, 2013. The Defendant stated that, around 11:30 p.m. or 12:00 a.m. on June 8, he went to help a friend paint his apartment. He did not arrive back home until 4:30 or 5:00 a.m. in the morning. The Defendant testified that he stayed awake so that he could watch A.T. and his brother after A.T.'s mother left for work. The Defendant confirmed that he had consumed seven or eight beers that night.

The Defendant testified that, while he was watching the children on June 9, 2013, he "noticed that [A.T.] had a hard stool early that morning after he woke up and [the Defendant] fed him." He testified that he "cleaned [A.T.] up" and "found some blood in his diaper," but that he "didn't think nothing [sic] about it until later on that day." The Defendant testified that, after changing A.T.'s diaper, he went outside on the balcony to smoke a cigarette and threw the diaper in a dumpster about ten to fifteen feet away. The Defendant stated that he noticed "what looked like cuts" on A.T.'s anus later that day, and so he called A.T.'s mother. The Defendant testified that A.T.'s mother told him to "put some Vaseline on it and make sure that he was comfortable." The Defendant stated that he later noticed an "off-white, green and pink substance" in A.T.'s diaper. The Defendant testified that when A.T.'s mother arrived home from work, he left for a friend's house. The Defendant said that A.T.'s mother called him after he left and told him she was taking A.T. to the hospital and asked the Defendant to come back to watch A.T.'s brother. The Defendant testified that he "got a little frustrated" with A.T. while he was watching him and that he "may have been a little rough, but [he] didn't hurt him." The Defendant confirmed that when he said he "may have been a little rough," he was referring to "handling [A.T.]" and picking him up or putting him down. However, the Defendant testified that he did not cause any injuries to A.T.

On cross-examination, the Defendant confirmed that he was alone with the children for eleven hours on June 9, 2013. The Defendant also testified that he first noticed A.T.'s injuries after he had been "rough" with A.T. At the conclusion of the proof, the jury found the Defendant guilty as charged.

**Sentencing Hearing.** At the sentencing hearing, Alisha Helton testified that she was employed by the Tennessee Department of Corrections and that she prepared the Defendant's presentence report, which was admitted without objection. Helton testified that the Defendant had a criminal history in Alabama, which included three outstanding warrants. The Defendant's criminal history also included a misdemeanor conviction in Giles County. Helton confirmed that the Defendant had been on probation in Alabama when he committed the instant offense, and that his probation was subsequently revoked. On cross-examination, Helton confirmed that the Defendant did not have any prior sex related offenses.

- 10 -

The trial court applied enhancement factor (1), that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (4), that the victim was particularly vulnerable because of age or physical or mental disability; (5), that the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense; (8), that the defendant before trial or sentencing has failed to comply with the conditions of a sentence involving release into the community; (13), that at the time the felony was committed, the defendant was released on probation; and (14), that the defendant abused a position of public or private trust. See T.C.A. § 40-35-114. The trial court did not find that any mitigating factors applied, and noted that this case was "one of the most heinous crimes" the court had ever seen. The trial court imposed a sentence of fifty years' incarceration, to be served at one-hundred percent. The Defendant filed a motion for new trial, which was heard and denied on April 18, 2016. This timely appeal followed.

## ANALYSIS

On appeal, the Defendant argues that (1) the evidence was insufficient to sustain his conviction for aggravated rape of a child, (2) the trial court improperly allowed specific testimony and medical records "regarding the diagnosis of 'child sexual abuse,'" and (3) the Defendant's sentence was unlawful. The State responds that the convicting evidence was sufficient, that the trial court did not abuse its discretion in admitting the challenged expert witness testimony and medical records, and that the Defendant has failed to prove the trial court's sentencing decision was not presumptively reasonable.

**I. Sufficiency of the Evidence.** First, the Defendant challenges both the sufficiency of the convicting evidence as well as his identity as the perpetrator. The State responds that the medical testimony conclusively proved that A.T. sustained injuries indicative of non-accidental, forcible, penetrative trauma, and that the Defendant was the only individual who was with A.T. during the time period in which the injuries were inflicted.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of

guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

Additionally, "[t]he identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

As relevant here, aggravated rape of a child is the unlawful sexual penetration of a victim by the defendant if the victim is three years of age or less. T.C.A. § 39-13-531(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7).

Taken in the light most favorable to the State, the evidence presented at trial showed that four-month-old A.T. was healthy and without injury when his mother washed him the evening of June 8, 2013. Subsequently, A.T. and his two-year-old brother were alone with the Defendant for eleven hours on June 9, 2013. When the victim's mother returned home, she discovered that A.T.'s anus was enlarged, red, swollen, bruised, and that there were visible tears. A.T. was taken to Hillside Hospital, where Dr. Oothout noted that A.T.'s rectum was torn, dilated, and bruised. Because A.T.'s injuries were non-accidental and Dr. Oothout was suspicious of abuse, A.T. was transferred to Vanderbilt Children's Hospital for a more thorough examination. There, A.T. was seen by more medical professionals and was examined under anesthesia by a pediatric surgeon who determined that A.T. had suffered penetration by an object larger than an inch in diameter. All of the medical witnesses testified that A.T.'s injuries were caused by forceful penetration, and that the injuries could not have been caused by any accidental means, including constipation or a fingernail cut, as the Defendant implied at trial.

Based on this evidence, we conclude that any rational trier of fact could find that the Defendant penetrated A.T.'s anus by some means. The Defendant argues that the State did not prove "what type of object, if any object, penetrated A.T.'s anus," and that the State did not present any evidence of the Defendant's semen on the A.T. or any of A.T.'s diapers or clothes. However, the State was not required to identify the actual object which caused the penetration to sustain a conviction of aggravated rape and, likewise, the presence of semen was not required to prove penetration. See id. §§ 39-13-531, -501(7). Additionally, although the Defendant argues that the victim's mother testified inconsistently regarding A.T.'s recent medical history and a prior diaper rash, the jury heard any conflicting evidence and chose to accredit the testimony of the State's witnesses. Likewise, by their verdict, the jury rejected the Defendant's theory that the injuries occurred before June 9, 2013, or as a result of constipation or a fingernail cut. As noted above, this court will not "re-weigh the evidence or substitute its inferences for those drawn by the trier of fact." See Dorantes, 331 S.W.3d at 379.

Finally, the Defendant argues that the State did not adequately establish his identity as the perpetrator. The Defendant primarily challenges the State's witnesses' testimony regarding when A.T.'s injuries occurred. He argues that, at most, he had the "'mere opportunity'" to commit the offense, and that the medical witnesses' differing timelines are "speculation and conjecture." Duncan and Dr. Estrada generally testified that A.T.'s injuries were new or recent; however, Dr. Oothout estimated that A.T.'s injuries had occurred within forty-eight hours, Littrell estimated that A.T.'s injuries had occurred within seventy-two hours, and Dr. Lovvorn estimated that A.T.'s injuries likely occurred within twelve hours. The Defendant is again challenging the credibility of the State's witnesses and the jury's conclusions regarding the weight of the evidence.

- 13 -

Moreover, although some of the medical experts estimated specific timeframes within which A.T.'s injuries likely occurred, all of the medical witnesses testified that A.T.'s injuries were new, particularly because A.T. had unhealed bruises and tears. Additionally, the victim's mother and A.T.'s usual babysitter, Martin, testified that A.T. had no injuries until he was left alone with the Defendant. Again, the jury accredited the State's witnesses and their testimony regarding the timing of A.T.'s injuries, as was their prerogative. Any rational trier of fact could have concluded that the Defendant committed this offense. Accordingly, the evidence was sufficient to sustain the Defendant's conviction.

**II. Admission of Evidence.** The Defendant next challenges the admission of certain medical testimony and records regarding A.T.'s "diagnosis of 'child sexual abuse.'" Specifically, the Defendant challenges (A) the admission of Dr. Oothout's testimony; (B) the admission of Dr. Estrada's testimony; (C) Lori Littrell's qualification as an expert witness and admission of her testimony; (D) admission of the Our Kids Center medical records; (E) admission of medical records from Hillside Hospital and Vanderbilt Children's Hospital.[3] The Defendant also contends that the individual and cumulative effects of these errors prejudiced his ability to receive a fair trial.

A. <u>Testimony of Dr. Oothout.</u> First, the Defendant challenges the testimony of Dr. Kevin Oothout. After describing his examination of A.T., Dr. Oothout testified as follows:

| | |
|---|---|
| State: | Okay. Did you make some conclusion based on what you saw there? |
| Dr. Oothout: | Yes, I did. |
| State: | And what was that conclusion? |
| Dr. Oothout: | I felt that it was -- it was non-accidental trauma. There was a high index of suspicion for some type of abuse. |
| State: | In fact, did you include the words, 'child abuse,' in this report? |
| Dr. Oothout: | I did on the diagnosis. |
| State: | Okay. Is that a common diagnosis that doctors make? |

---

[3] The Defendant's issues in this section have been reordered for clarity.

| | |
|---|---|
| Dr. Oothout: | Yes. |
| State: | Is that a diagnosis in [sic] included in the codes or is that just something that you see so rarely that you wrote that in? |
| Dr. Oothout: | No, I didn't write it in. We use a computer system now. I don't write anything but I have to cho[o]se from a drop-down menu of different diagnosis, and that was the one I cho[]se. |
| State: | And it was child abuse? |
| Dr. Oothout: | I believe it said, child abuse, sexual child abuse. |
| State: | Is that your medical opinion of what caused these injuries to this child? |
| Dr. Oothout: | I'm not sure. I looked for rectal injury in that drop down menu and it wasn't available, and I felt like that was the closest thing that I could cho[o]se from the list that fit. |

Initially, we note that the Defendant arguably waived this issue by failing to make any contemporaneous objection to Dr. Oothout's testimony at trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (citing State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987)). Additionally, the Defendant's reliance on his pretrial motion in limine requesting the preclusion of Dr. Oothout's testimony is insufficient because the trial court overruled the motion. See State v. McGhee, 746 S.W.2d 460 (Tenn. 1988) (holding that it is a case-by-case determination when a defendant fails to make a contemporaneous objection at trial to testimony after the trial court has overruled a defendant's motion in limine to exclude that evidence). Nevertheless, we will address the issue.

- 15 -

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702, which addresses the need for expert testimony and the qualifications of the expert, provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The Tennessee Supreme Court defined the role of trial courts in determining the admissibility of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

State v. Scott, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted). The witness's necessary expertise may be acquired through formal education or life experiences. Neil P. Cohen, et al., Tennessee Law of Evidence, § 7.02(4) at 7-21. However, the witness must possess such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise exceeds the scope of common knowledge and experience possessed by the average person. Id. (citations omitted).

Tennessee Rule of Evidence 703 provides guidance regarding the proper bases for expert testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow

- 16 -

testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

"Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." State v. Ferrell, 277 S.W.3d 372, 378 (Tenn. 2009) (citing State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Scott, 275 S.W.3d at 404-05 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

The Defendant argues that, pursuant to this court's decisions in State v. Turner, 30 S.W.3d 355 (Tenn. Crim. App. 2000) and State v. Dewey Burton, Jr., No. E2015-00879-CCA-R3-CD, 2016 WL 3351316 (Tenn. Crim. App. June 9, 2016), Dr. Oothout's testimony is not admissible because it pertains to an ultimate issue and "the jury could readily draw its own conclusions on the matter without the aid of the witnesses' opinion." Turner, 30 S.W.3d at 360. In Turner, this court held that it was improper for a medical expert to testify about "whether it would be child abuse for an adult male to hold a young child's arm against a kerosene heater, causing second degree burns." Id. We noted that, while Tennessee Rule of Evidence 704 generally allows opinion evidence, which embraces an ultimate issue, "opinion testimony is not admissible on an ultimate issue if the jury could readily draw its own conclusions on the matter without the aid of the witness'[s] opinion." Id. (citing Neil P. Cohen, et al., Tennessee Law of Evidence, § 704.2 (3d ed. 1995); Blackburn v. Murphy, 737 S.W.2d 529, 533 (Tenn. 1987)). Likewise, in Dewey Burton, Jr., this court held that it was improper for a medical expert to testify that it was child neglect to leave a seventeen-month-old alone in a bathtub while hot water was running. Dewey Burton, Jr., 2016 WL 3351316, at *7-8. However, in both Turner and Dewey Burton, Jr., we held that the errors were harmless because this court could not conclude "that the admission of the testimony more probably than not affected the judgment." Id. at *9; see also Turner, 30 S.W.3d at 360-61.

In general, we find the instant case distinguishable from Turner and Dewey Burton, Jr. In those cases, the experts were asked to opine as to whether the defendant was guilty of the crimes charged, child abuse and child neglect, respectively. Here, the challenged medical expert testimony concerns the sexual abuse of A.T., while the Defendant was charged with aggravated rape of a child. Although this is a narrow distinction, we find that these are two different categories of cases. In Dewey Burton, Jr., this court stated that the medical expert "did not explain how her opinion was based on

- 17 -

her medical expertise," and "[a]lthough the vast majority of [the medical expert's] testimony was relevant and helpful, her testimony in this regard was nothing more than her personal opinion about what is and is not neglectful parental conduct." Dewey Burton, Jr., 2016 WL 3351316, at *9.

Here, Dr. Oothout's provided a medical basis for his opinion, and his testimony was not merely a personal opinion. In fact, Dr. Oothout did not offer an opinion as to whether the Defendant raped or sexually abused A.T. While Dr. Oothout acknowledged that he included the words "child abuse" in his report, he testified that his diagnosis of A.T.'s injuries was "non-accidental trauma," and that he would have preferred to categorize A.T.'s injuries as "rectal injuries" in the medical records, but that he was limited by the electronic record system's pre-determined list of diagnoses. We believe Dr. Oothout adequately explained any use of the words "child abuse" or "child sexual abuse," and that his testimony was appropriate and did not relate to the ultimate issue or invade the jury's ability to draw its own conclusion. We also note that physicians have an affirmative duty to report child abuse and, accordingly, we cannot find that a physician's testimony regarding a diagnosis of child abuse is prejudicial, particularly in a case where the ultimate issue and charge is not child abuse. The Defendant is not entitled to relief.

B. Testimony of Dr. Estrada. The Defendant also challenges Dr. Cristina Estrada's testimony regarding a conclusion of sexual abuse. The Defendant again argues that the testimony was inappropriate and did not conform to the principles of Turner and Dewey Burton, Jr. Dr. Estrada testified as follows on redirect examination:

| State: | Dr. Estrada, once again, in your expert opinion, is this injury to [A.T.] consistent with child sexual abuse? |
| --- | --- |
| Dr. Estrada: | Without -- |
| Defense counsel: | Judge, I'm going to object to the form of that question and the relevancy. |
| Trial court: | Overruled. |
| Dr. Estrada: | I 100 percent believe that this was as a result of sexual abuse. |
| State: | No further questions, Your Honor. |

Unlike Dr. Oothout, Dr. Estrada provided an opinion as to whether A.T. was sexually abused. Accordingly, because the jury could have easily drawn this conclusion

for itself based on Dr. Estrada's testimony about A.T.'s injuries, the trial court should not have allowed Dr. Estrada to offer an opinion that A.T. was sexually abused. However, while we agree that Dr. Estrada's testimony was inappropriate, as in Turner and Dewey Burton, Jr., we also conclude that the error was harmless. Turner, 30 S.W.3d at 360-61; Dewey Burton, Jr., 2016 WL 3351316, at *9. The medical testimony presented in this case against the Defendant was overwhelming. Every medical witness at trial testified that A.T.'s injuries could not have been caused by constipation, a fingernail cut, or any other accidental means. Rather, all the medical witnesses testified that A.T.'s injuries were the result of penetrative trauma. Because this conclusion was so readily apparent from the medical evidence, the erroneous admission of Dr. Estrada's one isolated statement was harmless. Under these circumstances, we cannot say that this one statement more probably than not affected the judgment. The Defendant is not entitled to relief.

C. Qualification and Testimony of Lori Littrell. Next, the Defendant contends that Lori Littrell's qualification as an expert in child sexual abuse was inappropriate because it "automatically equate[d] the terminology Ms. Littrell used in her testimony to describe the injury to A.T.'s bottom as constituting 'child sexual abuse.'" Additionally, the Defendant contends that Littrell's testimony "was not helpful to the jury" and was "unnecessarily cumulative because the State could have obtained any desired testimony pertaining to the medical examination of A.T.'s bottom through the testimony of Dr. Oothout, Dr. Estrada, and Dr. Lovvorn." The State responds that Littrell was properly qualified to testify as an expert witness and that "her opinion assisted the jury in understanding the results of the victim's forensic examination." The State also points out that Littrell "did not testify that the victim's injuries constituted 'child sexual abuse.'"

Regarding her qualifications, Littrell testified that she had a master's degree in nursing and was certified as both a nurse practitioner and a physician's assistant. Littrell testified that she received specialized training in and presented lectures on child sexual abuse and that she was a member of various professional organizations. Littrell also testified that her training at Our Kids Center included forty hours of classroom training and observation or performance of one-hundred supervised examinations and that she had performed over one-thousand forensic examinations. After an extensive voir dire, the trial court found that, "based on her education, training, field of specialty, her prior certifications," Littrell was "imminently qualified." The trial court granted the State's request to qualify Littrell in the field of "child sexual abuse, and specifically, in the area of conducting and evaluating forensic examination[s] of alleged child abuse victims." Littrell subsequently testified that she performed a forensic examination of A.T. and found that his anus was red, bruised, swollen, torn, and dilated. Based upon these findings, Littrell opined that A.T.'s injuries were "consistent with penetrative trauma." Her testimony was clearly within the scope of her expertise and based on her personal

observations, special education, training, and experience. Further, Littrell's testimony was not cumulative as it was based on her own independent forensic examination of A.T., which no other witness testified about at trial.

Further, although the Defendant contests Littrell's qualification in the field of "child sexual abuse," Littrell did not testify that A.T. was sexually abused or mention "sexual abuse" or "child sexual abuse" in any manner. Regardless, this court has previously found on multiple occasions that an expert witness was properly qualified to testify regarding "child sexual abuse." See State v. Roy D. Wakefield, No. M2005-01136-CCA-R3-CD, 2006 WL 1816323 (Tenn. Crim. App. June 29, 2006) (holding that a nurse practitioner from Our Kids Center was qualified to testify as an expert witness in child sexual abuse); State v. Walter Williams, No. W2009-02438-CCA-R3-CD, 2011 WL 2306246 (Tenn. Crim. App. June 7, 2011) (holding that a nurse practitioner was properly qualified as an expert in child sexual abuse); State v. Mark Tracy Looney, No. M2014-01168-CCA-R3-CD, 2016 WL 1399344 (Tenn. Crim. App. April 7, 2016) (holding that a nurse practitioner from Our Kids Center was qualified to testify as an expert witness in child sexual abuse). We also note that the Defendant made no argument at trial or on appeal as to any alternative field Littrell should have been qualified in. The issue is without merit.

D. Our Kids Center Records. Next, the Defendant argues that the medical records from Our Kids Center constitute inadmissible hearsay "that would only be admissible if introduced into evidence as a business record through Ms. Littrell's testimony." The Defendant also contends that Littrell should never have been permitted to testify and, thus, the Our Kids Center records should not have been allowed into evidence. Alternatively, the Defendant argues that the trial court should have redacted seven specific statements because they "violate the principles" established in Turner and Dewey Burton, Jr. that an expert cannot testify "that the injuries sustained by a child constitute 'child abuse' or 'child sexual abuse.'"

First, the Defendant provides no legal authority or supporting argument for his hearsay argument. Accordingly, the issue is waived. See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). Additionally, we have already determined that Littrell was properly qualified and that her testimony was admissible. Further, none of the challenged statements in the Our Kids Center records even reference a "diagnosis of 'child sexual abuse.'" Instead, the statements were that "[A.T.'s] injuries were not accidental," that there were "concerns of sexual abuse," and that "[A.T.'s] injuries are highly concerning for inflicted trauma." The Defendant is not entitled to relief.

E. Hillside Hospital and Vanderbilt Children's Hospital Records. Similarly, the Defendant argues that the trial court erred by denying his motion to redact portions of the

medical records from Hillside Hospital and Vanderbilt Children's Hospital. Specifically, the Defendant challenges four statements indicating a diagnosis of "child sexual abuse" in the Hillside Hospital records by Dr. Oothout and two statements in the Vanderbilt Children's Hospital records that include "concerns of sexual abuse" and "a thorough investigation is warranted due to the possibility of inflicted injury."

The Defendant has again waived this argument by failing to support his claims with sufficient legal authority. The Defendant simply lists six statements from the medical records that he claims should have been redacted and then summarily asserts that he "incorporates by reference as if fully recited in this sub-section the previous arguments he has made as to why the trial court should have redacted these medical records to preclude any mention of a diagnosis of 'child sexual abuse.'" This is inappropriate. The Defendant's failure to comply with the basic rules of this court and to provide sufficient analysis for this court's review again constitutes waiver of the issue. See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). Waiver notwithstanding, as we have previously found, any reference to a "diagnosis" of "child sexual abuse" by Dr. Oothout was adequately explained at trial by the limitations of the electronic records system and Dr. Oothout's medical findings. The Defendant is not entitled to relief.

F. Cumulative Errors. The Defendant also argues that even if the aforementioned errors were individually harmless, the cumulative effect of these errors violates his right to a fair trial. See State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) ("The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial."). We have already concluded that there was only one error in the record, regarding Dr. Estrada's testimony, and that the error was insignificant in light of the overwhelming medical evidence in this case. Because we have already determined that the Defendant is not entitled to relief on any of the previous issues, we conclude that there is no cumulative error.

**III. Sentencing.** Finally, the Defendant argues that the trial court abused its discretion by imposing a sentence of fifty years. Specifically, he claims that the court "failed to consider the purposes and principles of sentencing," improperly applied two enhancement factors, and failed to impose the minimum sentence of forty years as "the least severe measure of punishment necessary."

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the

trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008).

Upon imposing a sentence, a trial court must consider the following: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b)(1)-(7). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. § 40-35-102(3)(C) and 40-35-103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

As an initial matter, pursuant to Tennessee Code Annotated section 39-13-531(b), the Defendant was required to be sentenced as a Range III, Persistent Offender for the aggravated rape of a child, a Class A felony. The Defendant was subject to a sentencing range of forty to sixty years, thus, the trial court's fifty-year sentence was within the applicable statutory range and presumed reasonable. Id. § 40-35-112(c)(1). In determining the appropriate length of the Defendant's sentence, the trial court applied six enhancement factors. On appeal, the Defendant does not challenge the trial court's application of enhancement factors (1), (8), (13), or (14), but asserts that factors (4) and (5) were improperly applied. See id. § 40-35-114.

As to enhancement factor (4), that "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability," the trial court found that "it struggled with the applicability of that particular factor simply because the statute does require three years of age or less. However, in this particular matter, we are dealing with a four-month-old child." See id. § 40-35-114(4). The trial court further noted that it "has not given that significant weight as an enhancing factor, but I do find it to be applicable." The Defendant argues that age and "particular vulnerability" of the victim are both essential elements of the offense and cannot be punishable by an enhancement factor.

- 22 -

However, the Tennessee Supreme Court has held that this factor can be used in an aggravated rape of a child case "if the circumstances show that the victim, because of his age or physical or mental condition, was in fact 'particularly vulnerable,' i.e., incapable of resisting, summoning help, or testifying against the perpetrator." State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993), superseded on other grounds by statute as stated in State v. Jackson, 60 S.W.3d 738, 741-42 (Tenn. 2001). Here, the victim was a four-month-old infant who could not walk, talk, summon help, or defend himself. Accordingly, we find the application of this enhancement factor appropriate in this case. See Adams, 864 S.W.2d at 35; see also State v. Collins, 986 S.W.2d 13, 23 (Tenn. Crim. App. 1998) (holding that a newborn infant was particularly vulnerable and enhancement factor (4) was properly applied).

The Defendant next contends that the trial court erred in its application of enhancement factor (5), that the Defendant treated the victim with exceptional cruelty during the commission of the offense, because "[t]his factor is usually applied in cases of abuse or torture." The Tennessee Supreme Court has held that evidence supporting the application of the "exceptional cruelty" enhancement factor requires a finding of cruelty "over and above" what is required for the offense itself. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001). In other words, "'[e]xceptional cruelty,' when used as an enhancement factor, denotes the infliction of pain or suffering for its own sake or from gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." State v. Reid, 91 S.W.3d 247, 311 (Tenn. 2002). This factor is most often found in cases of abuse or torture, but it has been found applicable in cases where traumatic and severe injuries were sustained by the victim. State v. Gray, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). When applying this factor, a trial court should articulate the actions of the defendant, apart from the elements of the offense, which constitute exceptional cruelty. State v. Goodwin, 909 S.W.2d 35, 45-46 (Tenn. Crim. App. 1995).

The trial court found that enhancement factor (5) was appropriate considering "the testimony of the physicians," and, specifically, the testimony of the pediatric surgeon who stated that, "[i]n this particular case[,] the anal opening when [the doctor] saw and examined this child . . . [sic] [was] four times the size of the normal stretched anal opening of a four-month-old." As the trial court noted, A.T.'s physical injuries in this case were particularly significant, and the physical evidence is sufficient to show that A.T. was abused beyond a penetration necessary to prove aggravated rape of a child. The proof showed that A.T. suffered multiple tears and bruising in addition to the significant dilation of his anus. Such bodily injury is not an essential element of the crime of aggravated rape of a child, which requires no injury, and thus, can properly be applied as an enhancement factor. See State v. James Lloyd Julian, II, No. 03C01-9511-CV-00371, 1997 WL 412539 (Tenn. Crim. App. July 24, 1997) (applying enhancement factor (5) in

a rape of a child case where the victim suffered additional injuries); but see State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995) (finding that enhancement factor (5) did not apply in a rape case where the injuries were included in the statutory definition of bodily injury which elevated the offense to aggravated rape). We conclude that the record supports the trial court's application of enhancement factor (5).

In any event, the trial court also found that a number of other factors applied, factors (1), (8), (13), and (14), and the record supports their application. See T.C.A. § 40-35-114(1), -114(8), -114(13), -114(14). Indeed, this court has held that application of even a single factor may be sufficient to justify an enhanced sentence. See, e.g., State v. Eric D. Charles, No. W2007-0060-CCA-R3-CD, 2008 WL 246023, at *6 (Tenn. Crim. App. Jan. 30, 2008); State v. Shawn McCobb and Marcus Walker, No. W2006-015-17-CCA-R3-CD, 2007 WL 2822921, at *4 (Tenn. Crim. App. Sept. 26, 2007). The Defendant's four unchallenged enhancement factors carried enough weight to support his mid-range sentence of fifty years, and the weight to be given the various factors is within the broad discretion afforded our trial courts.

The Defendant's argument that the trial court did not consider the purposes and principles of the sentencing act is also without merit. After analyzing the applicable enhancing and mitigating factors, the trial court thoroughly considered the evidence presented at trial as well as the Defendant's presentence report. Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of fifty years, the Defendant has failed "to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded sentences which reflect a proper application of the purposes and principles of our statutory scheme." Caudle, 388 S.W.3d at 280. Likewise, a trial court's duty to impose the least severe method of punishment does not entitle the Defendant to a presumptive minimum sentence. "Presumptive sentences" were eliminated by the 2005 Amendments to the Sentencing Act and trial courts now have the discretion "to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)). The record amply supports the fifty-year sentence imposed by the trial court. The Defendant is not entitled to relief.

## CONCLUSION

Upon review of the record and applicable law, we affirm the judgment of the Giles County Circuit Court.

_____
CAMILLE R. McMULLEN, JUDGE